**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| KATE ADAMS, | No.23-15970 |
| *Plaintiff-Appellant*, | D.C. No. 2:22-cv-01499- WBS-KJN |
| v. | |
| COUNTY OF SACRAMENTO; SCOTT JONES, Sheriff, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Eastern District of California
William B. Shubb, District Judge, Presiding

Argued and Submitted May 16, 2024
San Francisco, California

Filed September 9, 2024

Before: Sidney R. Thomas, Consuelo M. Callahan, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sidney R. Thomas;
Dissent by Judge Consuelo M. Callahan

## SUMMARY[*]

### First Amendment / Employment Retaliation

In an interlocutory appeal, the panel affirmed the district court's dismissal of First Amendment retaliation and derivative conspiracy claims brought by Kate Adams, the former Chief of Police for the City of Rancho Cordova, alleging that she was forced to resign from her post over allegations that while working for the Sacramento County Sheriff's Office she sent racist text messages.

In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern. Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest.

The panel examined the plain language, form, and context of Adams's two text messages, and held that under the circumstances presented by this case, sending private text messages to two friends during "a friendly, casual text message conversation," forwarding offensive racist spam images, and complaining about the images does not constitute "a matter of legitimate public concern" within the meaning of *Pickering v. Board of Education*, 391 U.S. 563 (1968). Adams's speech was one of personal interest, not public interest. Accordingly, the panel affirmed the district

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

court's dismissal of Adams's First Amendment retaliation and conspiracy claims.

Dissenting, Judge Callahan stated that Adams should have the chance to hold the County accountable for its harsh reaction to her speech. The public concern test should be applied leniently in this case where Adams's speech did not fall within the realm of workplace grievances, had no arguable impact on her employer, and touched on matters of social or political concern.

## COUNSEL

Karin M. Sweigart (argued), Harmeet K. Dhillon, Anthony J. Fusaro Jr., and Jeremiah D. Graham, Dhillon Law Group Inc., San Francisco, California, for Plaintiff-Appellant.

Dylan de Wit (argued) and David Norton, Porter Scott, Sacramento, California; for Defendants-Appellees.

## OPINION

S.R. THOMAS, Circuit Judge:

In this interlocutory appeal, we consider whether sending private text messages to two friends during "a friendly, casual text message conversation," forwarding offensive racist spam images, and complaining about the images constitutes "a matter of legitimate public concern" under *Pickering v. Board of Education*, 391 U.S. 563 (1968), and *Hernandez v. City of Phoenix*, 43 F.4th 966 (9th Cir. 2022). Under the circumstances presented by this case, we conclude

that the speech does not, and we affirm the district court's dismissal of the claim.

"We review a decision on a motion to dismiss for failure to state a claim de novo, accepting the allegations in the complaint as true and viewing them in the light most favorable to the plaintiff." *Galanti v. Nev. Dep't of Corr.*, 65 F.4th 1152, 1154 (9th Cir. 2023). "Whether an employee's speech addresses a matter of public concern is a pure question of law. . . ." *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2012). We review whether speech addresses a matter of public concern de novo. *Hernandez*, 43 F.4th at 977.

I

Kate Adams began working for the Sacramento County Sheriff's Office ("Department") in 1994. She became Chief of Police for the City of Rancho Cordova in March 2020. In 2021, she was forced to resign from that post over allegations that she sent racist messages.

The messages in question were sent on New Year's Eve in 2013 when Adams was having "a friendly, casual text message conversation" with her co-worker and then-friend, Dan Morrissey. The two were exchanging New Year's wishes, and Adams sent videos of her children playing. At some point in the exchange, Adams sent Morrissey a text message stating, "Some rude racist just sent this!!" along with two images she had received. The record does not reveal who sent Adams the images or their motivation. However, from context, it appears that Adams did not know the senders. One of the images depicted a white man spraying a young black child with a hose and contained a superimposed offensive racial epithet. The other message included an image of a comedian, with superimposed text

containing an offensive racial slur. Morrissey responded, "That's not right." Adams then replied in a message starting with, "Oh, and just in case u [sic.] think I encourage this . . ." However, the remainder of the text is not in the record. On the same evening, Adams also texted the same images to another co-worker and then-friend, LeeAnnDra Marchese, although the record does not reflect if any messages were sent with those transmittals.

Adams's messages were not posted on social media, nor otherwise made readily discoverable by the general public. Neither message contains an intent to communicate the images to the public, nor to transmit a comment on the images to the general public. The record is clear that the messages were intended for a purely private audience of several friends in the context of private, social exchanges during "a friendly, casual text message conversation."

Seven years passed without further incident. However, during that period, Adams's friendships with Marchese and Morrissey deteriorated. In 2015, Adams was promoted to Assistant Chief of Police for the City of Rancho Cordova.

In 2019, Adams was informed of potential misconduct on the part of Marchese. She forwarded the allegation to the Department's Internal Affairs Division. After Marchese learned of Adams's report, several anonymous misconduct complaints were lodged against Adams—none of which were found substantiated.

In July 2020, Adams filed a formal complaint of harassment and retaliation against Marchese with the County's Equal Employment Opportunity office. During the investigation, Marchese provided print-outs of the text messages that Adams had forwarded in 2013, but did not provide the surrounding text commentary from Adams. The

Department commenced an investigation of Adams. During the investigation, Morrissey provided his cell phone showing the 2013 texts. The Department then gave Adams a choice to either resign or be "terminated and publicly mischaracterized as a racist." An attorney for the County told her that if she agreed to resign, the investigation would never become public; however, if she refused to resign, "the investigation would fuel a 'media circus'" in which she would be labeled a racist. She chose to resign in September 2021.

However, six months later, in March 2022, the President of the Sacramento chapter of the NAACP published an open letter stating that Adams had sent racially charged pictures to other Sheriff's Department employees; the letter described the hose-spraying image and called for accountability. *The Sacramento Bee* then published an article repeating the open letter's allegations. As a result, Adams resigned from her longtime adjunct teaching position at a local university, and two prospective employers ended their consideration of her. She also claims anxiety, stress, and depression were caused by the significant blows to her professional career and personal reputation.

II

In August 2022, Adams filed suit against the County of Sacramento, the Sheriff, and several Does, alleging claims for (1) denial of procedural due process, (2) breach of contract, (3) deprivation of the right to free speech under the First Amendment, (4) First Amendment conspiracy, (5) false light invasion of privacy, (6) false light conspiracy, (7) intentional interference with prospective economic advantage, and (8) intentional infliction of emotional distress. The only causes of action at issue in this

interlocutory appeal are Adams's claim for violation of her
right to free speech under the First Amendment and her
derivative First Amendment conspiracy claim.

The district court granted the Defendants' motion to
dismiss Adams's first complaint for failure to state a claim,
but granted Adams leave to amend.  After Adams amended
her complaint, the district court dismissed the First
Amendment claims with prejudice for failure to plead that
the text messages constituted speech "on a matter of public
concern."   The district court held that "sen[ding] racist
images, along with [Adams's] disapproval of the images"—
as Adams described it—was not speech on a matter of public
concern because Adams "ma[de] no allegations that her
speech concerned either racism in her community or racism
in the police department."  In its initial dismissal, the court
recognized that Adams's speech was not on a matter of
public concern "because the speech was intended to be
private and [did] not relate to the personnel or functioning of
the Department."

Adams timely sought certification of the partial
dismissal order for interlocutory appeal, under 28 U.S.C.
§ 1292(b).  Defendants did not oppose, and the district court
granted certification.  A motions panel of our Court granted
Adams's petition for permission to file this interlocutory
appeal.

## III

"[T]he First Amendment prohibits government officials
from subjecting individuals to 'retaliatory actions' after the
fact for having engaged in protected speech." *Houston
Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022)
(quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)).  In
analyzing First Amendment retaliation claims brought by

government employees, we employ the familiar test established in *Pickering*. Under the *Pickering* framework, it is the plaintiff's burden to establish that "(1) she spoke on a matter of public concern; (2) she spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018). "If [a plaintiff] establishes such a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating [the employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech." *Id.*

"In evaluating the First Amendment rights of a public employee, the threshold inquiry is whether the statements at issue substantially address a matter of public concern." *Roe v. City and County of San Francisco*, 109 F.3d 578, 584 (9th Cir. 1997) (citing *Allen v. Scribner*, 812 F.2d 426, 430 (9th Cir. 1987)); *see also City of San Diego v. Roe*, 543 U.S. 77, 84 (2004) (per curiam). "If . . . the speech did not address a matter of public concern, the employee simply has no First Amendment cause of action under *Pickering*." *Roberts v. Springfield Util. Bd.*, 68 F.4th 470, 474 (9th Cir. 2023) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).

To determine "[w]hether an employee's speech addresses a matter of public concern," we consider "the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147–48 (1983). We assess whether an employee's speech involves a matter of public concern "at the time of publication." *City of San Diego*, 543 U.S. at 84.

In viewing the whole record, we consider Adams's two text messages, the substance of the two forwarded images, and the context of her conversations with Marchese and Morrissey as alleged in her complaint. We address the content, form, and context factors in turn, and we conclude that Adams's speech was one of personal interest, not public interest. Therefore, her text messages do not address a matter of public concern within the meaning of *Pickering*.

A

We start with the content of Adams's messages. "Speech involves matters of public concern 'when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest."'" *Lane v. Franks*, 573 U.S. 228, 241 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). The speech must involve "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego*, 543 U.S. at 83–84. "[T]he content of the communication must be of broader societal concern." *Roe*, 109 F.3d at 585. The speech must concern "'issues about which information is needed or appropriate to enable the members of society' to make informed decisions about the operation of their government." *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 102 (1940) (footnote omitted)). Put another way, as Professor Robert C. Post has explained, cases analyzing whether speech is "of public concern" have often followed either a "'normative' conception of public concern," or a "'descriptive' conception of public concern." Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, 103 Harv. L. Rev. 601,

10          ADAMS V. COUNTY OF SACRAMENTO

669–72 (1990). The normative approach asks whether "the content of the speech at issue refers to matters that are substantively relevant to the processes of democratic self-governance." *Id.* at 670. The descriptive approach requires that the speech be "about issues that happen actually to interest the 'public,' which is to say to 'a significant number of persons.'" *Id.* at 672. This First Amendment protection is grounded in the value of "the public's interest in receiving the well-informed views of government employees engaging in civic discussion." *Garcetti*, 547 U.S. at 419.

"[T]he essential question is whether the speech addressed matters of 'public' as opposed to 'personal' interest." *Desrochers v. City of San Bernardino*, 572 F.3d 703, 709 (9th Cir. 2009) (quoting *Connick*, 461 U.S. at 147). "[I]f the speech concerns information only of personal interest, 'a federal court is not the appropriate forum' in which to review the public agency reaction 'absent the most unusual circumstances.'" *Roe*, 109 F.3d at 585 (quoting *Connick*, 461 U.S. at 147). Because "restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest," *Snyder*, 562 U.S. at 452, speech concerning only "personal interest" generally does not cross the *Pickering* threshold. *Roe*, 109 F.3d at 585; *see also Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 965 (9th Cir. 2011).

In short, "if the communication is essentially self-interested, with no public import, then it is not of public concern." *Roe*, 109 F.3d at 585. "The focus must be upon whether the public or community is likely to be truly interested in the particular expression, or whether it is more properly viewed as essentially a private grievance." *Id.*; *see also Roberts*, 68 F.4th at 475 (restriction on private

communications concerning a misconduct investigation is
not a matter of public concern).

The distinction we have drawn between personal and
public interest applies even against the backdrop of
controversial issues like racism. To be sure, "protest[ing]
racial discrimination" is a matter of public concern "where
an employee speaks out as a citizen on a matter of general
concern." *Connick*, 461 U.S. at 148 n.8 (citing *Givhan v. W.
Line Consol. Sch. Dist.*, 439 U.S. 410, 415–16 (1979)).
"Disputes over racial, religious, or other such discrimination
by public officials" are a matter of public concern when they
involve the public's "deep and abiding interest" in
"governmental conduct that affects the societal interest as a
whole." *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917,
926–27 (9th Cir. 2004). Speech that addresses the topic of
racism as relevant to the public can involve a matter of public
concern. *Hernandez*, 43 F.4th at 978. However, speech that
complains of only private, out-of-work, offensive individual
contact by unknown parties does not.

There is no doubt that the images Adams received were
offensive. However, Adams's texts and distribution of the
images speak only of her exasperation at being sent the
images, which is an issue of personal—not public—concern.
Whether she was privately sent offensive, racist images
outside the workplace, without more, is not a matter of
public concern within the meaning of *Pickering*. The
content of her private communications to her friends did not
protest generally applicable "policies and practices" she
"conceived to be racially discriminatory in purpose or
effect." *Givhan*, 439 U.S. at 413. Nor does Adams suggest
her receipt of the images is connected to "wrongful
governmental activity" in the Department. *Alpha Energy
Savers*, 381 F.3d at 927.

The substance of the images themselves does not alter the *Pickering* content analysis. Indeed, "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). In this context, our analysis in *Hernandez* is instructive. There, we considered the case of a police officer who was fired after posting several images that "sought to denigrate or mock" Muslims and Islam. *Hernandez*, 43 F.4th at 978. But taken alone, the images' expressed hostility towards Muslims was insufficient for us to conclude that the content factor weighed in Hernandez's favor. Instead, we found the images to address matters of public concern because they concerned subjects that "receive[d] media coverage" like "government spending priorities" and "touched on matters of cultural assimilation and intolerance of religious differences." *Id.* In addition to their content, it was also significant in *Hernandez* that the statements were posted to his Facebook account, where "any member of the general public could view it." *Id.* at 973. Something more than discussing an offensive racial comment, communicated in a private text, is required for speech to involve a matter of public concern. *See Lamb v. Montrose Cnty. Sheriff's Off.*, 2022 WL 487105, at *7 (10th Cir. Feb. 17, 2022) (holding that private text messages sent to a friend complaining about racism did not constitute "a matter of public concern").

Nor were the images themselves "a subject of legitimate news interest." *City of San Diego*, 543 US at 83–84. While Adams now attempts to liken her texts to "commenting on an item of political news," we assess her speech at the time it was made. *Id.* (noting that the assessment of whether a matter is of public concern is made "at the time of publication"). "We look to what the employee[] actually

said, not what they say they said after the fact." *Desrochers*, 572 F.3d at 711. We examine the content of the statements at the time they were made, rather than rely on an employee's "post hoc characterizations" of their statements. *Id.* at 711. And "[a] statement 'does not attain the status of public concern simply because its subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest.'" *Leverington v. City of Colorado Springs*, 643 F.3d 719, 727 (10th Cir. 2011) (quoting *Salehpoor v. Shahinpoor*, 358 F.3d 782, 788 (10th Cir. 2004)).

When made, the texts involved a private matter—her receipt of offensive images transmitted by an anonymous sender. There is no suggestion in her complaint that these two images were newsworthy when she forwarded them to Marchese and Morrissey. "[T]he fact that the incident mentioned . . . gained public interest does not mean that the [speech] itself was framed in a manner calculated to ignite that public interest." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012). We do not know who sent Adams the images, and she makes no allegation that the images were of note in her community, her job, or to the public. Nor does she suggest their circulation to her was the result of broader issues in the police department.

In this instance, the subject matter—private receipt of offensive images—was also not "substantively relevant to the processes of democratic self-governance," Post, *supra*, at 670, nor an issue that was needed to enable members of society "to make informed decisions about the operation of their government." *McKinley*, 705 F.2d at 1114 (quoting *Thornhill*, 310 U.S. at 102). The subject matter of private forwarded offensive messages at the time the messages were

sent was not of interest to the general public, nor "a significant number of persons." Post, *supra*, at 672.

Thus, examining the plain language of Adams's texts and the forwarded images, we conclude she was commenting on a personal matter, and not making a public comment; therefore, Adams has failed to establish the content factor required in a *Pickering* First Amendment retaliation claim.

B

We next consider the form and context of Adams's speech. Here, the form and context—private social texts to a co-worker—weigh against finding her texts addressed a matter of public concern. "When assessing these two factors, we look to the public or private nature of the speech, and to the speaker's motive." *Turner v. City and County of San Francisco*, 788 F.3d 1206, 1211 (9th Cir. 2015); *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995) ("[T]he employee's motivation and the chosen audience are among the many factors to be considered in light of the public's interest in the subject matter of the speech."). As we have succinctly put it, the question as to motivation is "[W]hy did the employee speak (as best as we can tell)?" *Turner*, 788 F.3d at 1210 (quoting *Desrochers*, 572 F.3d at 715).

Thus, it is important whether the employee sought "to inform the public" about an issue of public concern, *Connick*, 461 U.S. at 148, or "made [their remarks] in the course of a conversation addressing . . . polic[y]" or "matter[s] of heightened public attention." *Rankin*, 483 U.S. at 386. Statements made in a public forum may weigh in favor of a finding that the matters discussed were "of public concern." For example, posting images online to "be viewed

by any member of the general public" suggests an intent to "foster discussion on those topics," which is different from speech directed to only a speaker's "fellow employees." *Hernandez*, 43 F.4th at 978; *see also Desrochers*, 572 F.3d at 715 ("Because the speech at issue took the form of internal employee grievances which were not disseminated to the public, this portion of the *Connick* test cuts against a finding of public concern.").

In this case, the answer to the question of "why did the employee speak" is evident from the record:   Adams received private offensive texts and complained about receiving them privately to two friends. And here, unlike the situation in *Hernandez*, the form of the communications was private texts not intended to be accessed by the public. Neither the form nor context of the messages indicates that Adams intended to discuss "matter[s] of heightened public attention" or policy. *Rankin*, 483 U.S. at 386.

Although the speech's form is not always "dispositive," a speaker's "narrow . . . focus and limited audience weigh against [a] claim of protected speech." *Roe*, 109 F.3d at 585. When speech is directed to a limited audience, and a conversation personal rather than political in nature, the form and context factors weigh against concluding that the speech addresses a matter of public concern.   *See Desrochers*, 572 F.3d at 714; *Roe*, 109 F.3d at 585. As we have noted on a number of occasions, the fact that private communications are directed to co-workers—rather than the public or press—cuts against a conclusion that the matter is of public concern.  *See Desrochers*, 572 F.3d at 710; *Roe*, 109 F.3d at 586; *Johnson*, 48 F.3d at 425.

The form and context of Adams's texts to Morrissey[1] evince nothing more than a casual private conversation among friends. As stated in the complaint, Adams and Morrissey were "engaged in a friendly, casual text message conversation" where they "exchanged Happy New Year's wishes and Ms. Adams shared videos of her children playing." The private texts were directed only to two recipients—an extremely limited audience. Adams intended for the messages to remain private, as they only resurfaced when the recipients revealed them years later. And the context—a text exchange among friends discussing their children and the holidays, free of political discourse— reinforces the fact that her texts express her personal adverse reaction at being sent the imagery, instead of advancing societal political debate. *See Lamb*, 2022 WL 487105, at *7.

The form and context of the communications confirm our conclusion that Adams's private texts were only meant to convey a personal grievance about receiving offensive private texts to her friends in the course of social conversation, not to comment on a matter of public concern. There is no indication in the context that she intended to make a public comment.

IV

Taken together, each factor—content, form, and context—forecloses Adams's claim that her speech addressed a "matter of public concern" within the meaning of *Pickering*. Adams's dismissal may or "may not be fair," *Connick*, 461 U.S. at 146, but unfairness alone does not

---

[1] The totality of Adams's conversation with Marchese is not preserved, so we rely on her conversation with Morrissey, but Adams does not allege anything distinct about the form or context of her texts with Marchese that would change our analysis on these factors.

create the "right to transform everyday employment disputes into matters for constitutional litigation in the federal courts." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011).

And, as we have noted, Adams has other causes of action that were not resolved by the district court. This interlocutory appeal only concerns her First Amendment retaliation and conspiracy claims. We, of course, express no view as to the other claims, which are not before us.

We affirm the decision of the district court as to the dismissal of the First Amendment retaliation and conspiracy claims and remand for further proceedings. We need not, and do not, reach any other issue urged by the parties.

**AFFIRMED.**

CALLAHAN, Circuit Judge, dissenting:

This is not your average First Amendment retaliation case. Kate Adams's speech occurred outside of work, was totally unrelated to her job, and should not have had any impact on her employment, but did. The public concern test was not meant to deprive public servants of all First Amendment protection in such circumstances. Our circuit has broadly construed the public concern test for decades. This is a strange case in which to suddenly start applying it strictly. Because Ms. Adams should have the chance to hold the County accountable for its harsh reaction to her speech, I dissent.

## I.

My colleagues and I agree on the broad strokes of the public concern test. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (internal quotation omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Greisen v. Hanken*, 925 F.3d 1097, 1109 (9th Cir. 2019) (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)). A principle the majority opinion conveniently elides is that, of these three factors, the "content of the speech is generally the most important." *Id.* (internal quotation omitted); *see Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 965 (9th Cir. 2011) ("Of the three concerns, content is king.").

The public concern test is a notoriously difficult one to apply, but guidance can be found from its purpose and origins. The test was developed to filter out clearly *un*protected speech by public employees—"namely, speech on 'matters only of personal interest,' such as speech addressing 'a personal employment dispute' or 'complaints over internal office affairs.'" *Hernandez v. City of Phoenix*, 43 F.4th 966, 976 (9th Cir. 2022) (quoting *Connick v. Myers*, 461 U.S. 138, 147, 148 n.8, 149 (1983)). Given that history, our court has long defined "public concern" broadly to include "almost *any* matter other than speech that relates to internal power struggles within the workplace." *Tucker v. State of Cal. Dep't of Educ.*, 97 F.3d 1204, 1210 (9th Cir. 1996). Just two years ago, we reaffirmed that "[m]ost speech

falling outside that purely private realm"—the realm of personal employment disputes and internal complaints— "will warrant at least some First Amendment protection and thus will qualify as speech on a matter of public concern," allowing the claim to be decided on the core elements of the *Pickering* framework. *Hernandez*, 43 F.4th at 977.

Ms. Adams's speech here—her text messages to her colleagues—do not fall in the realm of workplace grievances. Indeed, as the majority acknowledges (and as the parties agree), her texts were wholly unrelated to her job or her employer. Accordingly, the liberally construed public concern test should be applied leniently in this case, as I shall explain.

A.

The public concern test was created out of recognition that the First Amendment must apply differently to the government when it is acting as employer, instead of acting as sovereign. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968) (observing that the government has "interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general"); *see also Bd. of Cnty. Comm'rs, Wabaunsee Cnty. v. Umbehr*, 518 U.S. 668, 676 (1996) ("[T]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." (quotation omitted)). "A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech *that has*

*some potential to affect the entity's operations*." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (emphasis added).

"*Pickering* is based on the insight that the speech of a public-sector employee may interfere with the effective operation of a government office." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 908 (2018). Thus, when an employee's speech is about conditions at her job or actions by her government employer, the government employer's interest in self-protection is at its zenith. Subjecting government offices to litigation every time a disgruntled employee complains about the work environment would seriously undermine that office's ability to carry out its mission and serve the public. *See City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam). In cases arising from internal office complaints, the public concern test has its highest use: serving as a bulwark to deflect those employee grievances that do not truly concern the public.

Indeed, that was the precise context that led the Supreme Court in *Connick v. Myers*, 461 U.S. 138 (1983), to first make the public concern inquiry an explicit threshold test. In *Connick*, an assistant district attorney sought First Amendment protection after being discharged for circulating an intraoffice survey/questionnaire in response to being transferred against her wishes. *Id.* at 140–41. The Court held that the bulk of the questionnaire was "most accurately characterized as an employee grievance concerning internal office policy." *Id.* at 154. The Court reasoned that the assistant district attorney "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities," nor did she "seek to bring to light actual or potential wrongdoing or breach of public trust" by the office. *Id.* at 148.

This focus on what might generally be called "whistleblowing" against government actors takes center stage in many of our court's cases applying the public concern test, including those cited by the majority. *See, e.g.*, *Desrochers v. City of San Bernardino*, 572 F.3d 703, 712 (9th Cir. 2009) (citing absence of "allegations of conduct amounting to 'actual or potential wrongdoing or breach of public trust'" (quoting *Connick*, 461 U.S. at 148)); *Roe v. City & Cnty. of San Francisco* ("*Roe v. S.F.*"), 109 F.3d 578, 585 (9th Cir. 1997) ("Public employee speech is 'of public concern' if it helps citizens 'to make informed decisions about the operation of their government.'" (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). In rejecting Ms. Adams's claims, the majority relies heavily on the absence of indicia of whistleblowing— emphasizing that her texts were neither about wrongdoing by the Sheriff's Department nor sharing information that would enable informed decisions about the Department's operation.

But in imposing a supposed whistleblowing requirement, the majority considers only cases that, like *Connick*, have applied the public concern test to speech that occurred at work or about work. *See Roberts v. Springfield Util. Bd.*, 68 F.4th 470, 472, 475 (9th Cir. 2023) (prohibiting employee from speaking about his own alleged violation of employer's policies during internal investigation); *Desrochers*, 572 F.3d at 712–19 (sergeants' internal grievances against superiors); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 925–27 (9th Cir. 2004) (testimony about discrimination by governmental employer); *Roe v. S.F.*, 109 F.3d 578 (officer's memo regarding district attorneys not prosecuting his cases); *McKinley*, 705 F.2d at 1112, 1114 (officer publicly criticizing city's withholding of annual police

officer raises).     Indeed, "public concern" jurisprudence
overall "has typically focused on employee speech that takes
place at work or that addresses the policies of the
government employer."  *Roe v. City of San Diego*, 356 F.3d
1108 (9th Cir. 2004), *reversed on other grounds sub nom.
City of San Diego v. Roe*, 543 U.S. 77 (2004).

Because employee speech at work or about work often
*can be* viewed as an individual employment grievance not
entitled to constitutional protection, in those cases it is
necessary to conduct a searching inquiry into the motivation
for the speech (part of its context) and the content of the
speech to ensure it is sufficiently robust to communicate
some message of interest to the broader public.  That is
where our focus on some degree of whistleblowing comes
into play.  The court in *Desrochers*, for instance, held the
plaintiff-sergeants' internal grievances did not satisfy the
content factor because they merely involved "a personality
dispute centered on [their supervisor]'s management style"
and alleged no "actual or potential wrongdoing or breach of
public trust."  572 F.3d at 712 (quoting *Connick*, 461 U.S. at
148).  Coming to the opposite conclusion in *McKinley*, we
held the plaintiff-officer's public criticism of the city-
employer withholding annual officer raises—something that
impacted the plaintiff's personal working conditions—
nonetheless qualified for protection because it was about an
issue that impacted "the competency of the police force" and
its ability to efficiently perform its duties.  705 F.2d at 1114.

Alerting the public to government abuses or
mismanagement is perhaps the clearest form of speech on a
matter of public concern, but it is not the only form.
Precedent firmly establishes that speech need not involve
whistleblowing to touch on matters of public concern.  Take

another foundational Supreme Court case, *Rankin v. McPherson*, 483 U.S. 378 (1987).

In *Rankin*, a clerical employee in a county constable's office was discharged "for remarking, after hearing of an attempt on the life of [President Reagan], 'If they go for him again, I hope they get him.'" *Id.* at 379–80. (The employee made this remark informally and privately to a co-worker at the office after the two heard about the attempted assassination over the office radio. *Id.* at 381–82.) The Court held this remark "plainly dealt with a matter of public concern"—reasoning that the statement "was made in the course of a conversation addressing the policies of the President's administration" and "came on the heels of a news bulletin regarding what is certainly a matter of heightened public attention: an attempt on the life of the President." *Id.* at 386. Nowhere in its two-paragraph analysis did the Court pause to inquire whether the employee's off-the-cuff remark was serving any whistleblowing purpose or conveying a message the public would find informative. There was no need to go there because the Court was addressing speech whose content had nothing to do with the workplace and therefore could not be alternatively construed as an employee grievance.

Another clear example of the wide range of speech that may qualify without being directed to government (mis)conduct lies in our recent decision in *Hernandez*, 43 F.4th 966. There, we found a police officer's series of Facebook posts denigrating Muslims and Islam constituted speech on matters of public concern. *Id.* at 972–73, 977. As the majority notes, one of the four posts at issue (a link to an article headlined "'Military Pensions Cut, Muslim Mortgages Paid By US!'") addressed in some part "the subject of government spending priorities." *Id.* at 974, 978.

None of the other three posts had any connection to government conduct,[1] and yet we found all of them were also speech on matters of public concern. *Id.* at 973–74, 977. *Contra Connick*, 461 U.S. at 148 (looking for whistleblowing intent); *Roe v. S.F.*, 109 F.3d at 585 (looking for speech to inform on operation of government).

Thus, although in the context of speech related to one's employment or employer the test often does turn on the presence or absence of whistleblowing, the test does not always do so beyond that context. Courts must be careful not to allow litigants to, as the majority writes, "transform everyday employment disputes into matters for constitutional litigation." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011); *see Connick*, 461 U.S. at 154 (rejecting assistant district attorney's claim as an "attempt to constitutionalize the employee grievance"). But that's just it: Ms. Adams's texts were not about any employment dispute. She was texting friends about the jarring experience of having received two racist memes, apparently out of the blue. In cases like this one, which involve no "employment dispute[]" or "employee grievance" to begin with, the absence of whistleblowing content or motivation says little about how interested the public might be in the subject of the speech—and therefore should not factor into the equation.

---

[1] The first was a meme asserting that "Muhammad" is "the most common name for a convicted gang rapist in England." *Id.* at 973, 984. The second was a meme endorsing a supposed story of a British cab driver kicking an "Arab Muslim" out of his cab for requesting that the driver turn off the radio, in keeping with the passenger's faith. *Id.* at 973–74, 984. And the third meme depicted four purported quotations by Islamic scholars or scientists to "mock the[ir] supposed contributions to science." *Id.* at 974, 984.

### B.

Instead, we should apply the intentionally broadly phrased test of whether the speech at issue "can be fairly considered as relating to any matter of political, social, or other concern to the community." *Lane*, 573 U.S. at 241 (internal quotation omitted); *see Connick*, 461 U.S. at 146. Under binding precedent, the answer for Ms. Adams's text messages is clearly yes.

Ms. Adams's texts here bear a strong resemblance to one of the Facebook posts held to pass the public concern test in *Hernandez*, 43 F.4th 966. The second post addressed in *Hernandez* was "a meme depicting a photo of what appears to be a British cab driver opening the door to his cab. The text accompanying the photo states, 'You just got to love the Brits,' followed by two paragraphs of text describing a supposed encounter between a 'devout Muslim' and a cab driver in London . . . ." *Id.* at 973. The gist of the described encounter was that the Muslim passenger asked the cab driver to turn off the radio, and the cab driver stopped the cab and told the "Arab Muslim" to "'piss-off [sic] and wait for a camel!'" *Id.* at 973–74. In assessing the content factor for this post, the court held this meme "at least tangentially touched on matters of cultural assimilation and intolerance of religious differences in British society, which again are topics of social or political concern to some segments of the general public." *Id.* at 978.

In *Hernandez*, we did not look for any of the extra indicia of public importance that today's majority now piles onto the test. Officer Hernandez's xenophobic attempt at humor was not "substantively relevant to the processes of democratic self-governance." And, while the post was public, the meme cannot be said to have *informed* the public about anything—

let alone to have helped them "to make informed decisions about the operation of their government." *Cf. Roe v. S.F.*, 109 F.3d at 585; *McKinley*, 705 F.2d at 1114. Nevertheless, that post satisfied the content factor. Contrary to the majority's spin, this second post satisfied the content factor simply by virtue of having addressed "matters of cultural assimilation and intolerance of religious differences"— without the court citing any contemporaneous media coverage of these topics, as it had for the other three posts. *Hernandez*, 43 F.4th at 978.

Given that *Hernandez*'s cab driver post counted as speech on "matters of cultural assimilation and intolerance of religious differences" satisfying the content factor, *id.*, so too do Ms. Adams's texts—as speech on matters of racism. The majority is quick to point out that Officer Hernandez's Facebook posts, unlike Ms. Adams's texts, were posted to a public platform. *Id.* at 973. But the public or private nature of the communication implicates the *form* factor, not the content factor.**[2]** *See id.* at 977 (noting that form factor encompasses the statement's "time, place, and manner").

As *Hernandez* demonstrates, the majority also takes an overly narrow view of the content of Ms. Adams's speech, as a factual matter. The majority insists that because Ms. Adams's texts were merely conveying "exasperation" at having received offensive memes, she was voicing a purely personal concern. Elsewhere, the majority claims it is

---

[2] This is one of two key moments where the majority allows considerations of form and context to bleed into its analysis of content. In addition to emphasizing the private form of the texts to downplay their content, the majority also double counts the lack of allegations that Ms. Adams was participating in an ongoing discussion of racism, which goes to context, not content.

considering the full package of Ms. Adams's speech: both her two text messages and "the substance of the two forwarded images."  But in its analysis of the content factor, the majority suddenly forgets the images themselves.  The most egregious of the two images depicted a white man spraying a young black child with a garden hose and the superimposed text, "Go be a n***** somewhere else," without the asterisks.  While Ms. Adams's cover message was expressing disdain for the vile racism displayed in that image, she also sent the image itself.  And under *Hernandez*, that image at least tangentially touches on matters of racism. 43 F.4th at 973–74, 978 (cab driver meme); *see Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (teacher's hat bearing the slogan "Make America Great Again" constituted speech on "issues such as immigration, racism, and bigotry, which are all matters of public concern").

The fact that Ms. Adams may not have been *advocating* for or against anything in her series of texts should not change the content calculus, though the majority allows it to. The majority acknowledges that speech on "the topic of racism as relevant to the public" *can* satisfy the public concern test.  The majority rejects Ms. Adams's speech here, though, because she was "complain[ing] of only private, out-of-work, offensive individual contact."  As explained above, however, the lack of connection between her speech and her work should make it easier, not harder, for Ms. Adams to pass the public concern threshold in this non-grievance-based case.

Moreover, even if Ms. Adams's messages are construed to lack advocacy, this does not foreclose satisfaction of the content factor.  The district court in *Hernandez* made the same mistake the majority now makes in requiring an

advocacy component. There, the district court had found "no indication of [social and political] advocacy in the true content" of the Facebook posts—rejecting Officer Hernandez's characterization of his posts as commentary on, inter alia, "cultural assimilation." *Hernandez v. City of Phoenix*, 482 F. Supp. 3d 902, 914–15 (D. Ariz. 2020) (citing *Roe v. S.F.*, 109 F.3d at 585), *aff'd in part, rev'd in part*, 43 F.4th 966 (9th Cir. 2022). In reversing the district court's dismissal of the retaliation claim, this court held that the posts were in fact commentary on "cultural assimilation," despite the lack of accompanying advocacy.**[3]** *Hernandez*, 43 F.4th at 978.

Here, Ms. Adams's amended complaint characterizes her texts as "condemning racist images." This is an entirely fair characterization of her actual messages: first, "Some rude racist just sent this!!", followed by her statement denying "encourag[ing] this." *See Connick*, 461 U.S. at 146 ("fairly characterized" standard). Despite the majority's straw-man comparison, this is not a case of post hoc mischaracterization like *Desrochers*, where the plaintiff-sergeants tried to recast their grievances over "poor interpersonal relationships" with superiors as speech implicating the competency and efficiency of the police force. 572 F.3d at 711–12. *Hernandez*'s acceptance of the

---

[3] Supreme Court precedent further confirms that we look to the issue underlying the speech, not the quality of the speech itself, in applying the public concern test. Like the signs the Westboro Baptist Church protestors were holding in *Snyder v. Phelps*, Adams's text messages "may fall short of refined social or political commentary," but "the issue[] they highlight"—racism—is unquestionably a matter of public import. 562 U.S. 443, 454 (2011) (holding that signs stating "God Hates the USA/Thank God for 9/11" and "God Hates Fags" highlighted "matters of public import").

plaintiff's framing of his cab driver post, 43 F.4th at 978, dictates that we accept Ms. Adams's equally (if not more) justified framing of her text messages as speech about racism.    As in *Hernandez*, Ms. Adams's messages "assuredly did not address an internal workplace grievance or complaints about internal office affairs.    They instead addressed matters of social or political concern that would be of interest to others outside the [Rancho Cordova] Police Department."  *Id.* at 977–78.    That should have been the beginning and the end of the content factor analysis.

C.

Instead of following binding circuit precedent, the majority invents a new set of requirements for satisfying the content factor based on Tenth Circuit cases and a 30-year-old law review article.   *See* Robert C. Post, *The Constitutional Concept of Public Discourse: Outrageous Opinion, Democratic Deliberation, and* Hustler Magazine v. Falwell, 103 Harv. L. Rev. 601 (1990).   With no disrespect to Professor Post, whose work has been favorably cited in various Ninth Circuit decisions, his writings are no substitute for caselaw.   Nevertheless, the majority seems to adopt one of Professor Post's *descriptions* of the state of "public concern" jurisprudence (in 1990) as part of the standard for satisfying the content factor of the public concern test.   The majority rejects the subject matter of Ms. Adams's texts for not being "substantively relevant to the processes of democratic self-governance."  Post, *supra*, at 670.   This language has never before appeared in the opinions of this circuit or any other.   And, as previously discussed, many First Amendment claims have gone forward without content

that would meet that supposed standard.**[4]**  *See, e.g.*, *Rankin*, 483 U.S. 378; *Hernandez*, 43 F.4th 966.

The second prong of the majority's new test rests on true precedent, but precedent that it reads selectively. The majority's second prong asks whether the content of the speech concerned "an issue that was needed to enable members of society 'to make informed decisions about the operation of their government.'" Certainly, we have acknowledged that such speech "merits the highest degree of [F]irst [A]mendment protection." *McKinley*, 705 F.2d at 1114. But that does not mean all other types of speech merit *no* First Amendment protection—which is the consequence of rejecting retaliation claims at the threshold "public concern" stage. As *McKinley* itself states, this informative requirement (like the whistleblowing discussed above) is tied specifically to speech that could be viewed as an employment dispute or grievance. *See id.* ("Speech by public employees may be characterized as not of 'public concern' when it is clear that such speech *deals with*

---

[4] Indeed, Professor Post himself did not even offer this language as a definitional standard. It comes from a section of his article stating that "in most instances" the Supreme Court's use of the phrase "public concern" "signifies that the content of the speech at issue refers to matters that are substantively relevant to the processes of democratic self-governance." Post, *supra*, at 670. The very next sentence, however, critiques this conception of public concern as "lead[ing] directly to a doctrinal impasse." *Id.* As Post puts it, "every issue that can potentially agitate the public is also potentially relevant to democratic self-governance, and hence potentially of public concern." *Id.* "[C]ommunication for one purpose, such as gossip, will influence communication for another, such as self-government." *Id.* at 674. Thus, it appears that Professor Post would have understood Ms. Adams's texts about the racist memes to *qualify* as speech substantively relevant to the processes of democratic self-governance.

*individual personnel disputes and grievances and that* the information would be of no relevance to the public's evaluation of the performance of governmental agencies." (emphasis added)); *see also Roberts*, 68 F.4th at 474–75 (same); *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (same). When the discipline-triggering speech cannot—by any stretch—be viewed as airing an individual employee grievance, the plaintiff is not required to show that her speech had this informative quality. *See, e.g.*, *Rankin*, 483 U.S. 378; *Hernandez*, 43 F.4th 966.

Lacking sufficient Ninth Circuit precedent to reject Ms. Adams's speech, the majority turns to the Tenth Circuit for back-up. If the Tenth Circuit applied the public concern test comparably to our circuit's "broad[]" and "liberal" approach, that would be one thing. *See Dodge*, 56 F.4th at 777 ("What constitutes public concern is 'defined broadly[.]'" (quoting *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 978 (9th Cir. 2002)); *Roe v. S.F.*, 109 F.3d at 586 ("We adhere to a liberal construction of what an issue 'of public concern' is under the First Amendment."). But it does not. Tenth Circuit courts "construe 'public concern' very narrowly." *Butler v. Bd. of Cnty. Comm'rs*, 920 F.3d 651, 656 (10th Cir. 2019) (quoting *Leverington v. City of Colorado Springs*, 643 F.3d 719, 727 (10th Cir. 2011)). Our court has never taken that approach, and the majority provides no reason for its about-face.

Like the district court, the majority also relies on a superficially similar unpublished Tenth Circuit case in which a police officer's text message to a friend on his personal cellphone was held not to be speech on a matter of public concern. *See Lamb v. Montrose Cnty. Sheriff's Off.*, No. 19-1275, 2022 WL 487105 (10th Cir. Feb. 17, 2022). The text message sent in *Lamb* expressed dislike of the

officer's new work environment, mentioning "Racism" and lack of professionalism. *Lamb*, 2022 WL 487105 at \*1. The Tenth Circuit held this was not speech on a matter of public concern because the text was neither public nor "intended for public dissemination" and the use of "free-floating" terms like "Racism" without explanation did not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government." *Id.* at \*7 (internal quotation marks omitted). *Lamb* is distinct and not persuasive, however, because of the critical difference that the officer's speech was expressing *dissatisfaction with his employment and employer.* Like *Desrochers*, 572 F.3d at 712–19, *Lamb* relies on standards that are—or were, until today—unique to evaluating claims based on speech that can be construed as a workplace grievance.

## II.

The majority errs in applying rules common to workplace grievance cases to this case of speech that was both unrelated to Ms. Adams's work and not detrimental to her employer.[5]   The overarching interest in having a government office fulfill its mission effectively and efficiently is not impacted by employee speech wholly unrelated to the job or the office. Such cases do not demand strict gatekeeping because they carry no risk of admitting an employee-grievance claim dressed up as a constitutional

---

[5] When an employee's speech is facially unrelated to her job or employer, it might still have the potential to negatively impact her government employer and thus qualify as related to her employment. *See, e.g.*, *City of San Diego v. Roe*, 543 U.S. 77, 81–82 (2004) (officer's production and dissemination of pornography linked to police force). But here Defendants have never argued any detrimental impact from Ms. Adams's speech as it actually was: voicing objection to racist commentary.

claim.  Here, Ms. Adams's texts—in their full form and at the time of transmission, not as later misconstrued and selectively publicized by third parties—had no arguable impact on her employer.  Thus, the public concern test is only loosely applicable.  *See Garcetti*, 547 U.S. at 418 (restrictions imposed by the government as employer "must be directed at speech that has some potential to affect the entity's operations"); *City of San Diego*, 543 U.S. at 80 ("[W]hen government employees speak or write on their own time on topics unrelated to their employment, the speech can have First Amendment protection, absent some governmental justification 'far stronger than mere speculation' in regulating it." (citation omitted)).

Various courts and jurists have questioned whether the test should apply at all to employee speech unrelated to their employment.  *See, e.g.*, *Connick*, 461 U.S. at 157 (Brennan, J., dissenting, joined by Marshall, Blackmun, Stevens, JJ.) (noting that "[w]hen public employees engage in expression unrelated to their employment while away from the work place, their First Amendment rights are, of course, no different from those of the general public," limiting the relevance of the public concern test in that context); *Dible v. City of Chandler*, 515 F.3d 918, 927–29 (9th Cir. 2008) (supposing without deciding "the public concern test is not required when unrelated expressive activity takes place away from the work setting"); *id.* at 932 (Canby, J., concurring) ("Public concern should not be a hurdle depriving employee speech of First Amendment protection when that speech is unrelated to the employment."); *Locurto v. Giuliani*, 447 F.3d 159, 172–75 (2d Cir. 2006) (in dicta, discussing how Supreme Court precedent demonstrating "the public concern test does not apply neatly as a threshold test for expression unrelated to Government employment").

We need not tackle that question here. I take no issue with
the decision to apply the public concern test to these facts.
The problem is that the majority applies an inordinately
robust version of the public concern test in this case that
barely implicates its animating principles. The public
concern test does not disqualify Ms. Adams's speech, which
was not related to her employment, from First Amendment
protection.

## III.

"The public concern test was . . . intended to weed out
claims in which an adverse employment action is taken
against an employee for complaining about internal office
affairs, such as the employee's conditions of employment or
job status." *Roe v. City of San Diego*, 356 F.3d at 1115, *rev'd
on other grounds*. Thus, *Hernandez* found the form factor
weighed in the officer's favor in part because he "posted
each of the items at issue on his own time, outside the
workplace, using his personal Facebook profile." 43 F.4th
at 978. Whereas *Hernandez* recognized that these features
confirmed the non-grievance nature of the speech, today's
majority holds these very same circumstances *against* Ms.
Adams. And when *Hernandez* considered the context factor,
its analysis remained focused on whether the surrounding
circumstances revealed a connection to a workplace
grievance. *See id.* ("The context in which Hernandez's posts
were made also supports the conclusion that the posts were
not tied to any workplace dispute or grievance."). There are
no allegations connecting Ms. Adams's text messages to her
work or any workplace grievance. That should, at the very
least, have balanced out the other aspects of the form and
context factors on which the majority exclusively relies.

And in the end, "content is king." *Johnson*, 658 F.3d at 965. The content favors Ms. Adams because her comment on portrayals of racism touches on a "topic[] of social or political concern to some segments of the general public," *Hernandez*, 43 F.4th at 978, and neither her messages nor the images "address[ed] an internal workplace grievance or complaints about internal office affairs," *id.* at 977.

Today's decision demonstrates the real-life consequences of adopting an overly strict approach to free speech claims made by public employees. The majority withholds even the *possibility* of First Amendment protection for a dedicated public servant, who devoted 27 years of her life to protecting the people of Sacramento County. The First Amendment is supposed to protect the right to speak about political issues without fear of retribution by the government. Yet, the County forced Ms. Adams to resign for sharing her reaction to a meme reflecting disturbing "issues of the day," *Weeks v. Bayer*, 246 F.3d 1231, 1235 (9th Cir. 2001), and the majority says she may not even get a foot in the courthouse door. The County punished Ms. Adams for speech she had a right to make. At the very least, it should have to demonstrate a justification for doing so.

Today's opinion revises the public concern test in a way that deprives public employees of constitutional protection for their non-grievance speech. But "citizens do not surrender their First Amendment rights by accepting public employment." *Lane*, 573 U.S. at 231. Ms. Adams should not have been forced to surrender hers.